| | | |
|---|---|---|
| PAMELA JENKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:14-cv-1713 |
| | ) | Judge Wiseman |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Pending before the Court is Plaintiff Pamela Jenkins' Motion for Judgment on the Administrative Record (Doc. No. 14), to which Defendant Social Security Administration (SSA) has responded (Doc. No 18). Plaintiff did not file a reply to the SSA's response. Upon consideration of the parties' briefs and the transcript of the administrative record (Doc. No. 10),[1] and for the reasons set forth below, Plaintiff's Motion for Judgment will be DENIED and the decision of the SSA will be AFFIRMED.

### I. Magistrate Judge Referral

In order to ensure the prompt resolution of this matter, the Court will VACATE the referral to the Magistrate Judge.

---

[1] Referenced hereinafter by "Tr." followed by the page number found in bolded typeface at the bottom right corner of the page.

## II. Introduction

Plaintiff filed an application for supplemental security income ("SSI") under Title XVI of the Social Security Act on January 7, 2011,[2] alleging disability onset as of January 7, 2011,[3] due to HIV infection, schizophrenia and bipolar disorder. (Tr. 141.) Her claim to benefits was denied at the initial and reconsideration stages of state agency review. Plaintiff subsequently requested *de novo* review of her case by an Administrative Law Judge (ALJ). Plaintiff's case was heard on March 29, 2013, when Plaintiff appeared with counsel and gave testimony. (Tr. 26-61.) Testimony was also received from an impartial vocational expert. (Id.) At the conclusion of the hearing, the matter was taken under advisement until April 30, 2013, when the ALJ issued a written decision finding Plaintiff not disabled. (Tr. 6-21.) That decision contains the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since January 7, 2011, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: HIV infection, lumbar degenerative disc disease, osteoarthritis of the left shoulder and hand; and bipolar disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except she cannot more than frequently reach overhead, handle or finger with her left arm and hand; is limited to simple repetitive

---

[2] The Act and implementing regulations regarding Disability Insurance Benefits (contained in Title II of the Act and 20 C.F.R. Part 404 of the regulations) and SSI (contained in Title XVI of the Act and 20 C.F.R. Part 416 of the regulations) are, substantially identical. Barnhart v. Thomas, 540 U.S. 20, 24 (2003) (noting that the Title II and the Title XVI definition of "disability" is "verbatim the same" and explaining that "[f]or simplicity sake, we will refer only to the II provisions, but our analysis applies equally to Title XVI.") The Court will cite to the regulations interchangeably.

[3] Plaintiff initially claimed an onset date of January 26, 1995, (Tr. 136), that date was later amended to January 7, 2011; the date Plaintiff filed her application for SSI. (Tr. 28-29.)

work; cannot maintain attention and concentration for more than two hours without interruption; and cannot interact with the public.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born on October 20, 1970 and was 40 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7.  The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 7, 2011, the date the application was filed (20 CFR 416.920(g)).

(Tr. 11-13, 16-17.)

On June 17, 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 1–5), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. Id.

### III. Review of the Record

The following summary of the medical record is taken from the ALJ's decision:

The claimant has a history of HIV, but treatment notes show that the claimant's HIV is stable with good immune response and undetectable viral load (Exs. 4F, p. 4 and 5F, p. 3). At a May 2012 office visit, the claimant's general appearance was described as "healthy looking."

A diagnostic imaging report of the claimant's left shoulder from December 2010 showed AC and glenohumeral joint space narrowing consistent with

3

osteoarthritis. A diagnostic imaging report of the claimant's left finger showed osteopenia and osteoarthritic changes of the left hand. Although the claimant displayed 50% decreased range of motion in the left shoulder and fourth finger on several occasions, there were no focal abnormalities noted (Exs. 4F, p. 3 and 5F, p. 2).

The claimant presented to Seven Springs Orthopaedic and Sports Medicine (Seven Springs) on December 14, 2012, with complaints of a one week history of back pain with left leg numbness and tingling. Although the claimant displayed tenderness in the left paralumbar region into the left leg, her stance was erect with good heel to toe gait. While straight leg raise testing was positive, the claimant had negative crossover straight leg raise tests. The claimant's "EHL"[4] and quad strengths were symmetrical and equal. A diagnostic imaging report of the claimant's back showed minimal changes at L4-5. The claimant was administered injectable medication in the office and given a steroid dose pack and Flexeril (Ex. 15F, p. 5). The claimant returned to Seven Springs on December 29, 2012, with complaints of persistent back pain, despite medications. An examination of the claimant was essentially unchanged f[rom] her previous visit, except the claimant ambulated with a mildly antalgic gait.[5] The claimant was sent for a magnetic resonance imaging scan of her back (Ex. 15F, p. 3). The claimant presented to Seven Springs on January 17, 2013, for follow up and with complaints of excruciating back pain. Although the claimant had paralumbar soreness over her back, straight leg raise tests were normal. An examination of the claimant's lumbar spine showed normal alignment. With the exception of "EHL" weakness against resistance, the claimant displayed no obvious reflex, sensory, or motor deficits. The claimant's sensation was intact subjectively. She had easily palpable pedal pulse with brisk capillary refill. A magnetic resonance imaging report of the claimant's back revealed mild degenerative disc disease, but no evidence for nerve compression or central canal or foraminal stenosis or narrowing (Ex. 15F, p. 1). The claimant was sent for a nerve conduction study of the left lower extremity to assess for possible peripheral neuropathy or other root cause of her symptoms. The claimant was prescribed Ultram and advised to return after the nerve conduction study or sooner if she had problems (Ex. 15F, p. 2). It is uncertain if the claimant had a nerve conduction study of her left lower extremity because there are no additional records from Seven Springs for review.

The claimant has received mental health treatment for bipolar disorder at the Meharry Medical College Community Wellness Center. The claimant presented

---

[4] "EHL" refers to the "Extensor Hallucis Longus: a long thin muscle situated on the shin that extends the big toe and dorsiflexes and supinates the foot." "Extensor Hallucis Longus." Merriam-Webster.com. Merriam-Webster, n.d. Web. (last visited 11 Apr. 2017.)

[5] "Antalgic" means "marked by or being an unnatural position or movement assumed by someone to minimize or alleviate pain or discomfort (as in the leg or back)." "Antalgic." Merriam-Webster.com. Merriam-Webster, n.d. Web. (last visited 11 Apr. 2017.)

for a psychiatry follow up on March 7, 2011. Treatment notes document the claimant's reports that her medication Seroquel made her do "strange things." The claimant also reported that her medication Depakote was working, but stopped after two weeks. The claimant said that she stopped taking the Seroquel.

She told her mental health provider that she was previously treated with Elavil and that she liked this medication (Ex. 4F, p. 5). The claimant was started on Elavil (Ex. 12F, p. 1). Treatment notes from Seven Springs document the claimant's denial of psychiatric problems on review of systems (Ex. 15F).

The claimant had a psychological examination on May 5, 2011, at the request of the state agency. Although the claimant appeared to be an adequate historian, the examiner indicated that the validity of the information obtained during the evaluation was questionable due to possible malingering. The examiner formed diagnostic impressions of rule out malingering and rule out schizoaffective disorder, bipolar type (Ex. 6F, pgs. 5-6).

The claimant testified that she had last used marijuana eight days prior to her hearing and that "to my knowledge" had last used cocaine six months prior to her hearing. The claimant testified that both of her legs are constantly numb and sporadically painful. She said that she has low back pain and that her left side weakness causes her to drop things. She said that she cannot lift her left shoulder. The claimant testified that back and leg pain prevent her from sitting for more than 15 minutes at one time. When asked about this testimony after she had remained seated for 35 minutes, the claimant testified that she gets stiff after sitting for 15 minutes. As noted above, the claimant initially testified that she cannot stand or walk for more than ten minutes, but then acknowledged standing for 45 minutes at a time during her recent work activity. The claimant testified that she throws up every morning and has no energy for anything. She said that she has visual hallucinations and two to three panic attacks every day. The claimant claims that she only leaves her home three times each month.

I did not find the claimant to be a credible witness. Her testimony regarding her extremely limited ability to sit or stand was inconsistent with her work history since her alleged onset date and with her demonstrated ability to sit through her 42 minute hearing. Even taking into account claimant's incarceration from 1998 until October 2010, the claimant's extremely limited earnings record (Ex. 3D) raises a question regarding her motivation to work.

I give little weight to the opinion of the claimant's treating physician Dr. V. Berthoud (Ex. 16F) because he has only seen claimant on four occasions since March 30, 2005 (Exs. 4F and 12F). Dr. Berthoud does not refer to any abnormal medical findings which support his opinions nor are there any significant abnormal findings contained in his office notes. Dr. Berthoud treats the claimant for HIV and she has never had a detectible viral load. The extreme limitations

described by Dr. Berthoud are inconsistent with claimant's limited work activity since the alleged onset date. In addition, Dr. Berthoud's notes from different visits are largely verbatim identical. I also give little weight to the opinion of the state agency medical consultants who suggested that the claimant has the capacity for light activities because it fails to adequately consider the claimant's symptoms (Ex. 5F). Giving some weight to each opinion, I find that the claimant can perform the limited range of sedentary work described above. This finding is consistent with Dr. Berthaud's opinion that the claimant has to sit down while performing her job (Ex. 4F, p. 1).

I note the opinion of a consulting psychologist that claimant has marked limitations in the abilities to interact with others and to respond to changes in a routine work setting (Ex. 6F). I give little weight to these opinions because the psychologist did not diagnose any mental impairment which could be expected to cause those limitations. The only current diagnosis was rule out malingering and rule out schizoaffective disorder. Instead, I give significant weight to the opinion of the state agency psychologist because this opinion was based upon a review of all of the evidence including the report of the consulting psychologist (Ex. 8F).

(Tr. 14–16.)

## IV. Conclusions of Law

### A. Standard of Review

This Court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the

record contains evidence supporting the opposite conclusion. See Hernandez v. Comm'r of Soc. Sec., 644 F. App'x 468, 473 (6th Cir. 2016) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." Miller, 811 F.3d at 833 (quoting Gentry v. Comm'r of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014)).

## B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Parks v. Soc. Sec. Admin., 413 F. App'x 856, 862 (6th Cir. 2011) (citing Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . .'" Kepke v. Comm'r of Soc. Sec., 636 F. App'x 625, 628 (6th Cir. 2016) (quoting Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. See Anderson v. Comm'r of Soc. Sec., 406 F. App'x 32, 35 (6th Cir. 2010); Wright v. Massanari, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. Wright, 321 F.3d at 615–16; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA

8

must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. Anderson, 406 F. App'x at 35; see Wright, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Glenn v. Comm'r of Soc. Sec., 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ erred by failing to give the proper weight to the opinion of Plaintiff's treating physician. In a "Treating Physician Statement" he completed on January 23, 2013, Dr. Berthoud opined that Plaintiff suffers from fatigue as a result of her HIV infection, but that she did not require naps during the day. (Tr. 360.) He opined that Plaintiff had no side effects from her medications. (Id.) Nevertheless, Dr. Berthoud opined that Plaintiff would not be able to engage in sedentary work, "defined as being able to sit 6·out of 8 hours with occasional standing and walking, and requires lifting 10 lbs. occasionally, and requires frequently lifting and carrying lighter objects such as files and ledgers." (Id.) Dr. Berthoud explained that he did not believe Plaintiff could engage in sedentary work because of her "lack of concentration, fatigue, tiredness, weakness, pain in the legs and anxiety disorder." (Tr. 361.) He noted that in 2010, Plaintiff's symptoms rose to "this level of severity," but her "current level of impairment" did not commence until 2012. (Id.) Dr. Berthoud opined that Plaintiff would miss 20 days of work per month because of her symptoms. (Id.) He noted that Plaintiff experienced

9

chronic leg pain due to neuropathy, and that she had "marked limitation" in her "activities of daily living," "abilities to maintain social functioning," and "ability to complete tasks in a timely manner due to deficiencies in concentration, persistence, or pace" as a result of her symptoms. (Tr. 361-62.) Finally, Dr. Berthoud noted that "Ms. Jenkins has human immunodeficiency syndrome (HIV), chronic hepatitis C, peripheral neuropathy, iron deficiency anemia, osteopenia, osteoarthritis and memory loss." (Tr. 362.)

The ALJ is generally required to accord the opinion of a claimant's treating physician substantial deference. Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). Such deference, however, is due only when a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" before the ALJ. 20 C.F.R. § 404.1527(c) (2). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." Buxton v. Halter, 246 F.3d 762, 773 (6th Cir. 2001). An opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling weight. See Young v. Sec'y of Health & Human Servs., 925 F.2d 146, 151 (6th Cir. 1990); see also Francis v. Comm'r Soc. Sec. Admin, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all."). Ultimately, the determination of disability is "the prerogative of the Commissioner, not the treating physician." Warner, 375 F.3d at 390 (quoting Harris v. Heckler, 726 F.2d 431, 435 (6th Cir. 1985)). As such, a treating physician's opinion that a patient is disabled is not entitled to any special significance. See 20 C.F.R. §§ 404.1527(d)(1), (3), 416.927(d)(1), (3); Bass v. McMahon, 499 F.3d 506, 511 (6th Cir. 2007); Sims v. Comm'r of Soc. Sec., 406 F. App'x 977, 980 n. 1 (6th Cir. 2011) ("[T]he

10

determination of disability [is] the prerogative of the Commissioner, not the treating physician.").

If the ALJ decides not to accord the opinion of a treating physician controlling weight, the ALJ relies on a number of factors—including the length of the treatment relationship and frequency of evaluation, nature and extent of the treatment relationship, how well supported by medical evidence the treating physician's opinion is, the consistency of the treating physician's opinion with the record as a whole, and whether the treating physician is a specialist—to determine how much weight to give the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2)-(6). Where the ALJ finds that the treating physician is not entitled to controlling weight, the regulations require the ALJ to give "good reasons" for the weight given to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2). Consequently, a decision denying benefits has to state "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 1996 WL 374188 at *5 (1996). This procedural safeguard "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004).

Importantly, Plaintiff bears the burden of establishing that a treating physician qualifies as such under the Social Security Act and its implementing rules and regulations. See Sedore v. Colvin, 1:13-cv-849, 2014 WL 4080265, at *5 (W.D. Mich. Aug. 13, 2014) (citing Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 214 (6th Cir. 1986).) The purpose of the "treating physician rule" is to give more weight to the medical opinions expressed by physicians

11

who have had a long-term treatment relationship with the claimant. "[A] medical professional who has dealt with the claimant and [her] maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined the claimant but once, or who has only seen the claimant's medical records." Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994); see Rogers v. Commissioner, 486 F.3d 234, 242 (6th Cir. 2007); see also 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Social security regulations define a "treating source" as a physician or other acceptable medical source who has had an "ongoing treatment relationship" with the claimant:

> Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

20 C.F.R. § 416.927; see Coldiron v. Comm'r of Soc. Sec., 391 F. App'x 435, 442 (6th Cir. 2010). It is well established that a single visit fails to establish an ongoing treatment relationship. See Kornecky v. Comm'r of Soc. Sec., 167 F. App'x 496, 506 (6th Cir. 2006) (collecting cases). "Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship." Id. at 506–07.

While the ALJ referred to Valdimir Berthoud, M.D. as the claimant's treating physician (Tr. 15), there is evidence in the record to suggest that Dr. Berthoud did not qualify as a treating physician within the meaning of 20 C.F.R. §416.927. Dr. Berthoud is the Director of the

12

Division of Infectious Diseases at Meharry Community Wellness Center ("MCWC") and, as the ALJ noted, Dr. Berthoud is primarily responsible for Plaintiff's "HIV care." (See Tr. 15, 222, 223, 330.) Additionally, as the ALJ recognized, Dr. Berthoud has seen Plaintiff in-person only four times since he began treating her in 2005. (See Tr. 15, 223-226, 241, 330-332, 333.)[6] Further, the record reflects that Plaintiff was scheduled to see Dr. Berthoud on April 3, 2011 and June 18, 2012 (Tr. 226, 333), however, the absence of records for those appointments suggests that Plaintiff failed to keep them, and that rather than maintaining an "on-going" relationship with Dr. Berthoud, Plaintiff rarely saw him. Thus, Plaintiff does not appear to have met her burden of establishing that Dr. Berthoud was a "treating physician." 20 C.F.R. § 416.927.

Nevertheless, even if Dr. Berthoud did qualify as a treating physician the ALJ sufficiently explained why Dr. Berthoud's opinion regarding Plaintiff's limitations was entitled to "little weight." (Tr. 15.) The ALJ found that Dr. Berthoud's opinion was not supported by objective medical evidence because in opining that Plaintiff was so severely disable that she could not engage in even sedentary work, Dr. Berthoud "does not refer to any abnormal medical findings . . . nor are there any significant abnormal findings contained in his office notes" that would support the level of impairment about which he opined. (Tr. 15.) Additionally, the ALJ noted that Dr. Berthoud treats Plaintiff "for HIV and [that] she has never had a detectable viral load." (Tr. 15.) Finally, the ALJ noted that the "extreme limitations described by Dr. Berthoud are inconsistent with the [Plaintiff's] limited work activity since the alleged onset date." (Tr. 15.)

---

[6] The Administrative Record appears to contain only a portion of the notes generated during Plaintiff's visits with Dr. Berthoud at MCWC. (See Tr. 330-333 reflecting, at the bottom right of the pages, that the "Case Notes" comprised 12 pages, although only 4 pages were made part of the record; Tr. 222-226, reflecting, at the bottom right of the pages, that the "Case Notes" comprised 19 pages, although only 4 pages were made part of the record.) Additionally, Dr. Berthoud's notes from Plaintiff's November 29, 2011visit appear to be incomplete.

What is more, as noted above, Dr. Berthoud opined that 2012 marked the point at which Plaintiff's impairments made it impossible for her to perform even sedentary work. (Tr. 361) However, in March, 2011, as the ALJ noted, Dr. Berthoud wrote a letter for Plaintiff to give to her employer in which he explained that Plaintiff should perform her job sitting down. (See Tr. 15, 222, 226.) There is no objective medical evidence in the record to substantiate a significant decline in Plaintiff's health in 2011 such that by 2012 she could no longer perform even sedentary work. Indeed, as the ALJ noted, there appear to be few, if any, differences in Dr. Berthoud's case notes from Plaintiff's March, 2011 and May, 2012 visits, and to the extent there are difference, they do not explain why Dr. Berthoud believed that by 2012, Plaintiff could not engage in sedentary work. (See Tr. 15, 223-226 and 330-332.) Further, in completing the Medical Report on Adult with Allegation of Human Immunodeficiency Virus (HIV) Infection (Form SSA-4814-F5), on January 24, 2011, Dr. Berthoud did not note any marked limitations in Plaintiff activities of daily living, social functioning, or concentration, persistence and pace. (Tr. 181.) Again, the record is devoid of objective medical evidence to substantiate a significant decline in Plaintiff's functioning from 2011 to 2012.

Notably, Dr. Berthoud's opinion that Plaintiff could not engage in even sedentary work because of her painful neuropathy is contradicted by Plaintiff's testimony at the hearing that when she talked to Dr. Berthoud about her neuropathy, he took her off of one of her HIV medicines "because they [sic] cause neuropathy." (Tr. 40-41.)[7]    Likewise, Dr. Berthoud's

---

[7] Q (by ALJ) Have the doctors – have you talked to the doctors about what you testified about neuropathy?
A (by Plaintiff) Yes sir, basically my doctor talked to me about it and he just took me off one of my medications last month.
Q What medications is that?

14

opinion that Plaintiff's anxiety disorder prevented her from engaging in sedentary work is contradicted by Plaintiff's January 19, 2013, medication list which does not include any medication for anxiety. (Tr. 170). Additionally, as the ALJ noted, case notes from Plaintiff's January 7, 2013, visit to Seven Springs Orthopaedics and Sports Medicine clinic note that an MRI of Plaintiff's lumbar spine "reveal[ed] mild degenerative disc disease and bulges but no evidence for nerve compression or central canal or foraminal stenosis or narrowing." (Tr. 14, 351.) Moreover, as the ALJ recognized, Plaintiff's work history from 2011 through 2013, belied Dr. Berthoud's opinion that Plaintiff could not engage in even sedentary work. (Tr. 11.)

In 2011, Plaintiff worked for Goodwill Industries for about a month. (Tr. 54.) On August 6, 2011, Plaintiff was hired to work at Krystal's fast food restaurant. (Tr. 126.) Although Plaintiff could not remember how long she worked at Krystal's, (Tr. 33), the record reflects that she received 3 paychecks from Krystal's. (Tr. 125.) Plaintiff quit her job at Krystal's. (Tr. 33.) Sometime later, Plaintiff started working at Jack in the Box fast food restaurant. (Tr. 132-135) Plaintiff testified that she began working at Jack in the Box in January, (Tr. 34), however, the record reflects that Plaintiff was paid by Jack in the Box for the pay period

---

A  Oh, it's the D-I-D one, the desasene [PHONETIC] or something like that. He took me off that he said because they cause neuropathy.
Q  And was that – what was that medication for?
A  My HIV.

                              *   *   *

Q  Do you have any side effects from any of the medications that you take for your HIV?
A  He just took me off of one that I had the side effect. He took me off one, I had a side effect. One of them messed up the nerves in my head and then the other one cause the neuropathy.
(Tr. 40-41.)

commencing November 26, 2012 through the pay period ending January 20, 2013. (Tr. 132-135.) Plaintiff quit her job with Jack in the Box. (Tr. 48.)[8]

On this record, the ALJ did not commit error in finding that, to the extent that he can be considered a treating physician, Dr. Berthoud's opinion was entitled to little weight. Moreover, the ALJ sufficiently explained his rational for this finding. Accordingly, Plaintiff fails to establish error on this ground.

Plaintiff next claims that the ALJ erred by giving the opinion of consultative examiner, Mistie Germek, Ph.D., little weight and by giving significant weight to the opinion of the non-examining state agency psychologist George T. Davis, Ph.D. Dr. Germek conducted a psychological evaluation of Plaintiff on May 5, 2011. (Tr. 261.) Dr. Germek did not review any of Plaintiff's medical records prior to conducting her examination and Plaintiff was the "sole informant" during the examination. (Id.) Dr. Germek did not conduct any objective testing of Plaintiff's functioning. (Id.) After her single meeting with Plaintiff, who provided all the information available to Dr. Germek, Dr. Germek did not diagnosis Plaintiff with any mental health conditions. Rather, she noted the following "diagnostic impressions:" rule out malingering, rule out schizoaffective disorder, bipolar type, cocaine and cannabis dependence, sustained full remission, rule out antisocial personality disorder, and rule out borderline intellectual functioning. (Tr. 266.)

Social security regulations and rulings establish the framework for the ALJ's consideration of medical opinions. See 20 C.F.R. §§ 404.1527, 416.927; SSR 96-2p.

_____

[8] Although Plaintiff claims she quit her various jobs because of her pain, because she could not keep up with the work and because of medical appointments, the relative dearth of medical evidence, the fact that Plaintiff was never fired for her alleged failures as an employee and the ALJ's determination that Plaintiff's testimony was not credible, suggest otherwise. (Tr. 14-15.)

Acceptable medical sources are divided into three categories: treating sources, examining but non-treating sources; and non-examining sources. Id. As explained above, a treating source "means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation" consistent with accepted medical practice, and "who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527. An examining, but "nontreating source . . . has examined the claimant but does not have, or did not have, an ongoing treatment relationship with h[im]." Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 875 (6th Cir. 2007) (internal citation and quotation marks omitted). A "nonexamining source is a physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." Id. (internal citation and quotations marks omitted).

"When evaluating medical opinions, the SSA will generally give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined her." Id. (internal citations and quotations marks omitted). However, the SSA is only required to "give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion." Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 514 (6th Cir. 2010) (internal citation omitted). Indeed, the Sixth Circuit has long held that the that "the regulation requiring an ALJ to provide 'good reasons' for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one non-treating source's opinion over another." Wright v. Colvin, No. 1:15-cv-01931, 2016 WL 5661595, at *9 (N.D. Ohio Sept. 30, 2016) (citing Kornecky v. Comm'r of Soc. Sec., 167 F. App'x 496, 506-07 (6th Cir. 2006). Likewise, the ALJ is "under no special obligation" to provide great detail as to why the opinions of the nonexamining providers "were more consistent with the overall record" than

the examining, but nontreating providers. Norris Comm'r of Soc. Sec., 461 F.App'x 433, 440 (6th Cir. 2012). As long as "the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements. . . ." Id.

Although not obligated to do so, the ALJ amply explained why he accorded "little weight" to Dr. Germek's opinion that Plaintiff had "marked limitations in the abilities to interact with others and to respond to changes in a routine work setting." (Tr. 16.) Most notably, the ALJ recognized that Dr. Germek failed to diagnosis Plaintiff with "any mental impairments which could be expected to cause those limitations." (Id.) As the ALJ noted, Dr. Germek opined that her diagnostic impressions were "rule out malingering and rule out schizoaffective disorder." (Id.) Plaintiff acknowledges that Dr. Germek noted that she might be malingering, but argues that Dr. Germek also mentioned that she may have been honest. However, if the ALJ's decision is supported by substantial evidence, reversal would not be warranted even if substantial evidence supports the opposite conclusion. Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir. 2005).

There was substantial evidence to support the ALJ's determination that Dr. Germek's opinion was due "little weight" and Dr. Davis' opinion was entitled to "significant weight." (Tr. 40.) First, in her opinion Dr. Germek recognized substantial limitations in her ability to conduct a thorough evaluation of Plaintiff given that:

> The amount of effort that [Plaintiff] gave for this evaluation is not known. Although at times she appeared to be genuine, there were moments that felt like she could have been exaggerating her current mental health problems. It would have been helpful to have documentation of the behavioral problems she reported having in prison. For example, her mood at the time of the evaluation appeared euthymic, although she was reporting that she was extremely depressed, angry, irritable and having hallucinations. Also, she was saying she is an irritable, evil and angry person who does not like being around other people, she appeared to be very content, polite, comfortable and happy during the evaluation. It is apparent

18

that she has mental health problems given her legal history, but it is not known if she exaggerated these problems to aid in her effort to get disability. Overall, her affect was incongruent to how she said she had been feeling. . . .

She states she has constant some [sic] problems with her short-term memory and concentration abilities, but could only provide examples related to occasionally forgetting to take her medications and being easily distracted at times throughout the day. She did not appear to be distracted during this interview and her short-term memory appeared to be intact. Although Pamela appears to fall into the borderline range/low range of intellectual functioning, no formal intellectual testing was done at this time. Also, due to potential malingering, an accurate assessment of her cognitive abilities and potential limitations in her concentration abilities and in her short-term, long-term and remote memory functioning cannot be determined.

(Tr. 264-65.) Second, in contrast to Dr. Germek who received all of her information solely from Plaintiff, Dr. Davis' opinion "was based upon a review of all of the evidence including the report of the consulting psychologist." (Tr. 16.) In other words, in addition to considering Plaintiff's subjective complaints, as contained in Dr. Germek's report, Dr. Davis was able to review the objective medical evidence before opining as to Plaintiff's RFC. Finally, Drs. Germek and Davis generally agreed about the existence of Plaintiff's mental impairments, it was only the level of impairment about which they disagreed. For example, like Dr. Germek, Dr. Davis recognized that Plaintiff was impaired in her ability to interact with others, but based on Plaintiff's subjective complaints, as contained in Dr. Germek's evaluation, and the objective medical evidence, Dr. Davis' RFC concluded that this impairment only limited Plaintiff's interaction with the general public. (Tr. 286.) Likewise, Drs. Germerk and Davis both recognized that Plaintiff "can adapt to infrequent changes." (Id.)

Viewing the record as a whole, there was ample evidence to support the ALJ's decision to give little weight to Dr. Germek's opinion, which was based solely on the Plaintiff's subjective complaints, the veracity of which Dr. Germek questioned, and to give greater weight

to Dr. Davis opinion. Moreover, the ALJ adequately explained his reasoning for giving Dr. Germek's opinion less weight than Dr. Davis' opinion.

Plaintiff raises as a third claim of error that the ALJ improperly gave more weight to the opinions of the non-examining state agency medical consultants then he did to Dr. Berthaud and Dr. Germek. The Court has already thoroughly discussed the ALJ's decision as it relates to the opinions of Dr. Berthoud and Drs. Germek and Davis. The only other medical opinion upon which the ALJ relied was the state agency medical consultant, Michael N. Ryan, M.D. The ALJ gave Dr. Ryan's opinion little weight because he found that Dr. Ryan's conclusion that Plaintiff "has the capacity for light activities . . . fail[ed] to adequately consider [Plaintiff's] symptoms. (Tr. 15.) Nevertheless, giving some weight to Dr. Ryan's opinion, and "consistent with Dr. Berthoud's opinion that [Plaintiff] has to sit down while performing her job," the ALJ crafted Plaintiff's RFC assessment finding that she was capable of performing sedentary work. (Id.) Thus, the ALJ did not give Dr. Ryan's opinion more weight than he gave Dr. Berthoud's opinion. Moreover, to the extent that Dr. Ryan's opinion contradicted the objective medical evidence and Dr. Berthoud's opinion, the ALJ rejected it. The ALJ did not err in determining the weight to be given to the opinions of treating, evaluating and consulting medical professionals.

Finally, Plaintiff contends that the ALJ erred by failing to perform a function-by-function assessment of her RFC as required by SSR 96-8p, 1996 WL 374184 (July 2, 19976). To be sure, SSR 96–8p mandates that the ALJ "individually assess the exertional (lifting, carrying, standing, walking, sitting, pushing, and pulling), and non-exertional (manipulative, postural, visual, communicative, and mental functions) capacities of the claimant in determining a claimant's RFC." Delgado v. Comm'r of Soc. Sec., 30 F. App'x 542, 547 (6th Cir. 2002). However, case law does not require the ALJ to discuss those capacities for which no limitation is alleged. See

id. (listing cases). The ALJ fully specified Plaintiff's exertional and nonexertional limitations in his RFC. As noted above, the ALJ found, based on the evidence in the record, that Plaintiff could perform sedentary work, as defined by 20 C.F.R. § 416.927(a), except that Plaintiff could not "more than frequently reach overhead, handle or finger with her left arm and hand." (Tr. 13.) Additionally, the ALJ found that Plaintiff "is limited to simple repetitive work; cannot maintain attention and concentration for more than two hours without interruption; and cannot interact with the public." (Id.) Consequently, this argument must be rejected.

In sum, Plaintiff's claims of error have no merit, and the decision of the ALJ is supported by substantial evidence on the record as a whole. Accordingly, the ALJ's decision will be affirmed.

## V.  Conclusion

In light of the foregoing, Plaintiff's Motion for Judgment on the Administrative Record will be DENIED and the decision of the SSA will be AFFIRMED. An appropriate order is filed herewith.


Thomas A. Wiseman, Jr.
SENIOR DISTRICT JUDGE